Good afternoon, Your Honors. P. Joseph Sandoval for the Petitioner. I'd like to reserve two minutes for rebuttal. Your Honors, this case comes from an affirmance without an opinion from the Board of Immigration Appeals. The immigration judge found that the Petitioner was not credible and then continued with a finding that the Petitioner had not established past persecution, and that was tainted with the adverse credibility finding, and also not meeting the burden of showing that there was a possibility of future persecution. The Petitioner submits that the adverse credibility finding is not supported by substantial evidence on the record, and I'd like the Court to consider the immigration judge's decision very specifically with respect to what appears to be five reasons for the adverse credibility finding. The first was that the immigration judge found that there was some implausibility or inconsistency regarding the Petitioner's faith, her knowledge of the faith, her understanding of the tenets of the religion, and certain terms with respect to Jehovah's Witnesses. Secondly, the immigration judge relied on several omissions, which she found were central and relevant and went to the heart of the claim, but the Petitioner feels that those omissions were not significant, so they didn't go to the heart of the claim. And they were, in fact, mentioned in her initial declaration. The immigration judge did recognize that there are instances, and the case law does allow, where the oral testimony may be used to supplement the declarations. However, notwithstanding the fact that the judge recognized that, she still found that it was fatal to her claim, and it was certainly fatal to credibility. And then there was also a question about demeanor. The immigration judge, at the record at page 61, talks about how the Petitioner paused, testified slowly, didn't go directly to the highlight or the major point. But that puts the Petitioner in this type of proceeding in a Catch-22, where the Petitioner may, in fact, want to go forward slowly, consistently, chronologically, but the immigration judge would prefer somebody to go directly to the point and, therefore, bypass a lot of testimony that may be needed in order to establish that it's detailed, it's consistent, and it's credible. Well, earlier, in an earlier case, the I.J. simply said, I didn't find the Petitioner credible or sincere, which leaves a lot to speculation as to what that all means, if it's anything other than a conclusion. Now, where the I.J. puts in the record, specifically, the kind of characteristics of testimonial behavior, saying, well, that shows that it isn't well-founded because testifying slowly isn't, doesn't show credibility. Is that your argument? Our argument is that because somebody testifies slowly or speaks slowly or tries to move forward chronologically does not necessarily mean that they're testifying untruthfully. Well, no, but we're trying to, we have to give some deference to the immigration judge who's watching the person, and a reasonable interpretation is that she was not spontaneous, that she was rehearsed. Now, she could have said those things, I suppose, and then that would have been a more direct way of impeaching the credibility. And you're correct, Your Honor. She could have said that, but she didn't. She merely said that she didn't go directly to the heart of the claim, that she was leading up to it. In this case, Your Honor, the adverse credibility finding was akin to shaking a tree until something falls out where the immigration judge could hang her hat on and say, this is the reason. And nothing significant fell out. This is not a case where there were three different declarations that were inconsistent internally. This is not a case where the Petitioner was caught in a lie and then recanted. This is not a case where there was some type of documentary evidence that shows, in fact, that there was a falsehood that was presented to the Court, which would then, in fact, lead to an adverse credibility finding. If you look at the record, there's very, very little there to support that. I think she said at some point she was fleeing for her life, leaving the Soviet Union. Yes, she did say that she was fleeing. But she also, the I.J. pointed out that she'd taken several trips to the United States and a trip to Germany. Why isn't that significant? Well, two things, Your Honor. The first would be that at page 63 of the certified administrative record, she does talk about something being inconsistent with what somebody would do if they were fleeing for their life. And that's conjecture. And conjecture alone is not enough unless there's something else. Secondly, the fact that ---- Wait, wait, wait. Wait a minute. If somebody says, I fear for my life and I make four trips in and out of the country that I now say I've fled because I fear for my life, you're saying that the I.J. can't look to that as a question of credibility? Certainly the I.J. can look to it, but also the I.J. must look to that in the context of what those trips were about and what was happening in the country at that time and what was happening specifically to the Petitioner. Okay. Well, that's not what you said. You said it's pure speculation. So tell me why. Well, there was conjecture, we believe. All right. Conjecture. How so? What should they have done? Well, first, we believe that the immigration judge should have recognized this Court's logic and reasoning in de Maize, Job v. INS, which indicates that just because you go to another country, in this case Germany, and not immediately apply for asylum doesn't mean that you're not credible or you're any less credible. If that were the case, there would be very few asylum cases that could be granted because people routinely stop in different places. But that's not what the I.J. said. She said that she sought medical treatment, yet the respondent voluntarily returned to her home on three occasions after even being in the United States. Yes. But, again, I'm asking you to take a look at the context. She can be going back, even though she's fearful, but perhaps that fear hasn't risen to the level where she is to the point where an asylum application in a third country or another country is an option for her. It's plausible that she would go back and then there was an intervening incident that would finally push somebody over the edge. Everybody has a point. Does that make the I.J.'s reference to returning to a country where you're fearful improper? No, I'm not saying it's improper, but I think the ultimate finding of an adverse credibility finding, because somebody did go back to their country or traveled several times, is not proper. I think that's improper because you have to look at what happened if there was an intervening factor. In this case, she does testify about something that happened in April of 1999. And if she's to be believed, it was an atrocious event. It was an event that involved a kidnapping, an assault, a battery, psychological torture. And then after that event in 1999, notwithstanding the fact that she had traveled back and forth from Russia, after that event, that is finally the point, her breaking point. And again, I believe that everybody has a breaking point where they finally say, okay, I've had enough, this is enough, this is when I have to make this decision whether to remain or whether to go. And at this point, in April of 1999, after this incident, that is, we believe, when she said, okay, I can't go back. This last event was enough. We've got about a minute and a half left. Do you want to reserve it? Yes, I'd like to. Thank you. Good afternoon, Your Honors. John Cunningham from the Department of Justice appearing on behalf of the Attorney General. I think as a matter of clarity, it might be helpful if I point out the distinction that the immigration judge made in his decision with regard to the Petitioner's being a member of the Jehovah's Witness. The immigration judge said that he was prepared to believe that Ms. Sulzbaugh-Esteva had become a member of the Jehovah's Witness faith since she was in the United States. And there was plenty of evidence to support that. She submitted a letter from an elder of a Jehovah's Witness congregation here in Los Angeles that she had started attending services there in the spring of 2000. She submitted a photograph of her being baptized in March of 2001. And she also submitted a medical directive that she had signed also in March of 2001 indicating that she would decline blood transfusions in accordance with the Jehovah's Witness faith. And the immigration judge said, yes, I am prepared to believe that this person has become a member of the Jehovah's Witness faith since she has been here. The question, though, the one he had trouble with, I'm sorry, she had trouble with, was whether the Petitioner had been a member of the Jehovah's Witness faith while she lived in Russia, which, of course, was the linchpin of her asylum claim. And that's where the immigration judge decided that she could not believe that claim. And the key to her finding was her examination of the Petitioner on certain tenets of the Jehovah's Witness faith. The INS has supplied an exhibit, this is exhibit six on the record, a document summarizing certain fundamental beliefs of that faith. And you'll find this on page 147 of the record, continuing into 149. And the immigration judge looked at this and asked the Petitioner some questions. And he didn't cherry-pick. He didn't try to trip her up on obscure points. I'm sorry, Your Honor. Kennedy. Her name is Christine. She. I'm sorry, Your Honor. She didn't try to trip the Petitioner up on obscure points. She asked some questions having to do with really the fundamentals of any religion because it had to do with the afterlife. She asked the Petitioner, is there a heaven or a hell? And the Petitioner said, no, there isn't. And that's just wrong. Exhibit six makes that clear. She also asked the Petitioner, what happens to the soul upon death? And the Petitioner said the soul continues, returns to God. The body dies, but the soul returns to God. And exhibit six makes it clear that according to the Jehovah's Witness faith, the soul dies along with the body at the time of death. And the immigration judge. How does this fit with your theory that, well, you know, the immigration judge grants that she became a member of the Jehovah's Witnesses after she got here? Well, the Petitioner had claimed, Your Honor, that she had first become a member of the Jehovah's Witness faith and at least started studying for the Jehovah's Witness faith in 1996, in January 1996. She still doesn't know it. She still didn't know these things at the time of her, at the hearing, when presumably she had been a member for some time. That's right. I mean, the immigration judge was prepared to credit at least. But that doesn't undercut the fact that she might have been a member in Russia, does it? Well, it weakens the claim, Your Honor, because she testified at the hearing that she had started studying the Bible in 1996, that she had met Jehovah's Witnesses at that time, and that by the spring of 1998 she had progressed to the point where she had been invited to preach on behalf of that faith. And the – I think the immigration judge was reasonable and on solid ground in concluding that someone who was that faithful and had become that knowledgeable of this particular faith ought to know these things, and that because she didn't know these things, the immigration judge was simply not prepared to believe this claim. And with that basis, the story that the Petitioner told about the things that happened to her in Russia between 1996 and 1999 simply fell apart, at least as a basis for asylum. The Court has already noted that the Petitioner did leave, the Soviet did leave Russia several times and returned, including two trips to the U.S. She came here to Los Angeles because she had relatives here, and twice she returned to Russia. And the immigration judge simply did not believe that someone who had been subjected to the harm that this Petitioner claimed to have been subjected to would have done that. My colleague has pointed out accurately that after the last trip to the United States, before she came here finally, there was an incident where a Petitioner claimed that she had been abducted and beaten by persons who were punishing her for being a Jehovah's Witness. And that's – that incident took place in April of 1999. And the immigration judge was troubled because in her declaration, the Petitioner mentioned an abduction, but then at the hearing added certain horrific details that were not in the declaration. She said that she was forced to put on a military uniform. Now, this is significant because Jehovah's Witnesses, the immigration judge pointed this out, are forbidden by their faith from obeying national service laws. That's why we have so many asylum cases involving Jehovah's Witnesses. They tend to get in trouble in countries around the world because they will not accept national service laws or military service. So putting a military uniform on a Jehovah's Witness would be a highly offensive act. She then claimed that while she had that uniform on, the men urinated on her. And this is, of course, a grotesque humiliation, emotionally traumatizing. And the immigration judge quite reasonably concluded that it's – that should have been in the declaration. Someone ought to have put that in the declaration. And to add it at the hearing is the sort of inconsistency, the sort of elaboration that this Court's precedents allow a finder of fact to take note of in rendering an adverse credibility finding. It's not that she was inventing a new claim, but she was adding new details that tended to strengthen her case for asylum. And the immigration judge was acting on the basis of substantial evidence. That inconsistency, that absence in the declaration creates the substantial evidence that supports the adverse credibility finding. That really is all I have in my prepared remarks. I know it's been a long day for everyone. Does the Court have any further questions for me? No. All right. I thank the Court for its attention. Thank you, Mr. Cunningham. All right. The rebuttal, Mr. Sandoval. Yes. Thank you. Just two points. As stated in the brief, Aguirre v. Cota versus the U.S., this Court, the Ninth Circuit, has held that or understands that applications are frequently filled out by poor and illiterate people who do not speak English and are unable to retain counsel, and that certain omissions in the declaration need not be fatal to a credibility finding. Second ---- But, you know, I take your point, but just looking at that declaration, I am struck by the absence of the kind of detail that appears earlier in the declaration on a less horrific event. There's quite a bit of detail about the assault in the market and quoting the traitors and Satanists, and yet when she gets to this event later on, it's just much more condensed. What would be the explanation for that? Well, the explanation could be, and she was never fully given the opportunity to explain that because it came down in the oral decision that this was a critical point, but ---- No, no, I'm just saying that, you know, just looking at the cold record, just looking at this document where there's a lot of detail before the April 1999 incident and then the 90, you know, all she says is that they beat and tortured me. This application was filled out in English, and it's very likely that the person that filled this out may have omitted that without the Petitioner's knowledge. It may not have been read back to her, and she wanted, once she was in a venue where she could testify in Russian, that she put that in. Just one last point. Religion didn't exist in Russia in 1991. This is a new concept that's even still new today, and we believe that it's unfair to place upon people coming from Russia, whether they're Jewish or Muslim or Jehovah's Witness or any other faith, that they should somehow be as knowledgeable as we would want them to be regarding their religiosity. And when I was preparing for this case, I was thinking about an old Hasidic tale about a rabbi that went to the forest, and he had a time of trouble. He said a prayer, and he did the ritual. And then many, many years later, his student went, and he didn't know the prayer, but he knew the ritual. And years and years later, his student went, and he just knew her to be. And that's from Elie Wiesel. And maybe that's enough. And to prejudice the petitioner because she's not somehow more expert in this religion, we believe is unfair, and it happens constantly in these courts. Thank you very much. Thank you. Thank you.  Case is submitted for decision. Last case on the case.
judges: T.G. Nelson, Tashima, Fisher